**GENERAL MILLS, Inc., v. STEELE.**

No. 11313.

Circuit Court of Appeals, Fifth Circuit.

Jan. 8, 1946.

Rehearing Denied Feb. 15, 1946.

Writ of Certiorari Granted May 27, 1946.

See 66 S.Ct. 1341.

368

HUTCHESON, Circuit Judge, dissenting on original hearing.

———◆———

Alfred McKnight, of Fort Worth, Tex., and Charles E. France, of Oklahoma City, Okl., for appellant.

Cecil A. Morgan and T. S. Christopher, both of Fort Worth, Tex., for appellee.

Grover Sellers, Atty. Gen., of Texas, for amicus curiae.

Before HUTCHESON, WALLER, and LEE, Circuit Judges.

WALLER, Circuit Judge.

Appellee agreed to transport, as a contract motor carrier, the merchandise of Appellant for a period of three years, in an area having a radius of 150 miles, for the compensation of his actual expenses plus ten per cent. He performed his agreement until it was lawfully terminated three years later. There was in effect at the time of the making of this agreement, and during the entire three years, a statute, and an order of the Railroad Commission, of Texas, providing that the rates which a contract motor carrier, in competition with a common carrier, could charge should not be less than the minimum rates that a common carrier, performing substantially similar services, could charge.

Before Plaintiff could engage in the business as a contract motor carrier it was necessary for him to make application to, and secure a permit from, the Railroad Commission. In the application for such permit it was at least appropriate, and perhaps requisite, that the applicant should exhibit the contract under which he proposed to engage in such carriage. In conformity with the understanding between the parties, a proposed contract was prepared by Appellant, in which Sec. 13 provided that for such transportation of the Defendant's merchandise the Plaintiff would receive his actual expenses, plus ten per cent. But when this contract was submitted by Mr. Steele to Mr. Morgan, one of his attorneys, the latter, on February 28, 1941, wrote Mr. Steele as follows:

"Dear Mr. Steele:

. "Since you left this morning, I have again carefully considered the proposed contract to be entered into between you and General Mills.

"Paragraphs 13, 14, 15, 16 and 17, which are set forth on pages 4 to 7, are in direct conflict with the statutes of the State of Texas and therefore they must be eliminated from the contract. In lieu thereof the following paragraph should be inserted:

" 'It is mutually agreed between the parties that the rate to be charged by the first party and paid by the second party for the services contemplated to be rendered as provided in this contract shall be such rates, charges or tariffs as may be fixed by the Railroad Commission of the State of Texas, and in conformity with the rules and regulations now in existence or that may hereafter be promulgated by said Commission.'

"Therefore, we recommend that your contract be rewritten whereby you delete the paragraphs above listed and insert in lieu of the above.

"Very truly yours,
"(Sgd.) Cecil A. Morgan.

"Mr. Steele:

"P. S. A custom has long prevailed in this state that contract carriers must carry such provision as outlined in the letter to which this is attached relating to rates and charges. Then after the contract carrier certificate has been issued the contract carrier and shipper work out their own arrangements. Therefore there is very little for your company to be concerned about regarding this change.

"Very truly yours,
"(Sgd.) Cecil A. Morgan.

"Special delivery."

On March 27, 1941, Mr. Colfix, the Division Comptroller of General Mills, Inc., after Mr. Steele had shown him Mr. Morgan's letter of February 28, wrote an inter-

office communication[1] to Mr. Steele, who was then an employee of the Defendant, in which he stated, among other things, that if the substitution of the paragraph as suggested by Mr. Morgan were made:

"It would appear from this that if we are to live up to the contract that the basis of charges you would make to us would be the rate specified by the Railroad Commission. McCraney had the idea that the Railroad Commission might not promulgate any rates. In that case we would have to have a charge not in conformity with the contract, which might cause difficulty."

On April 3, 1941, Mr. Christopher, a law partner of Mr. Morgan, and one of counsel for the Plaintiff, wrote Mr. Colfix, Division Comptroller for Defendant, stating among other things:

"For your information and the basis upon which Mr. Morgan's recommendation was made with reference to the paragraph pertaining to rates, the Texas law (Article 911b, Vernon's Annotated Civil Statutes) provides as follows:

" 'The Commission is hereby vested with power and authority and it is hereby made its duty to prescribe rules and regulations covering the operation of contract carriers in competition with common carriers over the highways of this State and the Commission shall prescribe minimum rates, fares and charges to be collected by such contract carriers which shall not be less than the rates prescribed for common carriers for substantially the same service.'

"From the foregoing, you will see that the Statute itself fixes the rate to be charged by contract carriers as 'not less than the rate prescribed for common carriers for substantially the same service.' "

Mr. Christopher then concludes this letter as follows:

"I believe this fully answers your question, but if there are other questions we shall be pleased to answer them, and further than that I might make some valuable suggestions to Mr. Steele or to yourself with reference to this matter the next time Mr. Steele is in the office."

On April 5 Mr. Colfix wrote another interoffice communication to Mr. Steele, suggesting that the latter make arrangements for them to meet with Mr. Christopher at Fort Worth at an early date. This conference was held and concerning what occurred the testimony of Mr. Colfix is undisputed. He testified that:

"I indicated to these gentlemen that the form of contract that they proposed to us was entirely different than the understanding that Mr. Steele and our company had as to the financial arrangements for compensation, and I attempted to determine from them whether or not this contract was first, legal, and second, whether or not it would make possible the type of financial arrangement that we wished, and they assured me, first, that in order to get a permit it was necessary to put in the standard clause and that the Railroad Commission had never prescribed rates for this type of

---

[1] "March 27, 1941.

"Mr. L. H. Steele,
"Wichita Falls.
"Mr. L. B. Colfix,
"Oklahoma City.

"You received a letter from your attorney, Mr. Morgan, in which he recommended certain changes in the contemplated contract to be entered into between you and General Mills. The principal change has to do with the method of compensation for trucking services, and it is recommended by Mr. Morgan that the compensation be specified in the contract as follows:

" 'It is mutually agreed between the parties that the rate to be charged by the first party and paid by the second party for the services contemplated to be rendered as provided in this contract shall be such rates, charges or tariffs as may be fixed by the Railroad Commission of the State of Texas, and in conformity with the rules and regulations now in existence or that may hereafter be promulgated by said Commission.'

"It would appear from this that if we are to live up to the contract that the basis of charges you would make to us would be the rate specified by the Railroad Commission. McCraney had the idea that the Railroad Commission might not promulgate any rates. In that case we would have to have a charge not in conformity with the contract, which might cause difficulty.

"I think before we can give further consideration to this form of contract we should know definitely what kind of rates, if any, have been established by the Railroad Commission. Is there any way you can find out what factors they use in determining their rates and to what extent they may be expected to assign rates and when and if your permit is approved?"
"LBC/FH"

154 F.2d—24

service, and it was their opinion that such rates would never be prescribed; that we could go ahead and make this form of contract and then before we started our operations that we could legally execute a supplemental contract for the type of service that would be rendered by Steele for us."

On April 11, 1941, a letter from Mr. Christopher to Mr. Colfix stated:

"It is absolutely necessary so far as obtaining the grant of the contract carrier permit is concerned that the contract between General Mills and Mr. Steele recite that the charges to be made will be such charges as have been prescribed by the Railroad Commission of Texas, * * *."

Mr. Christopher further stated in this letter:

"It is my thought on this matter that it should be entirely agreeable with you to make the contract as is proposed by Mr. Steele now in your possession, and that thereafter and after the contract carrier permit is granted, if it is granted, and after you have had some experience with the operation that it is going to be necessary and entirely proper under the law that some supplemental contract be entered into based upon the service rendered."

Mr. Christopher further stated:

"Personally I do not believe that there will be any element of violation of the law involved if subsequently some additional contract is entered into supplemental to the original contract adjusting the rates based upon experience and the service actually rendered in comparison to service of common carriers. To me, however, it is simply a reasonable business risk, if it is a risk, which you can afford to take."

On April 17, 1941, the Defendant, by Mr. Colfix, wrote Mr. Christopher, stating, among other things, that:

"After full consideration of the matter our attorneys are of the opinion that it is quite in order for us to make this type of contract and later have a supplemental agreement for costs as may be agreed upon between Mr. Steele and General Mills."

The real intention of the parties for compensation to Mr. Steele by the payment of expenses, plus ten per cent, was, upon the suggestion, advice, and assurance of the attorneys for Mr. Steele, withdrawn and paragraph 13, as drafted and suggested by Mr. Morgan, was inserted in the writing to be submitted to the Railroad Commission. The inserted paragraph is as follows:

"13. It is mutually agreed between the parties that the rate to be charged by the first party and paid by the second party for the services contemplated to be rendered as provided in this contract shall be such rates, charges or tariffs as may be fixed by the Railroad Commission of the State of Texas, and in conformity with the rules and regulations now in existence or that may hereafter be promulgated by said Commission for the kind and character of service to be rendered hereunder."

The permit was granted to Mr. Steele on July 9, 1941, and on July 31, 1941, the amendatory contract, as contemplated and agreed upon, was executed between Appellant and Appellee, in which paragraph 13 of the prior instrument was amended so as to put into effect that which had been the real agreement all along, namely, to pay the Plaintiff his expenses, plus ten per cent for the services to be rendered.

The testimony of Mr. Colfix, the letters aforementioned, the fact that the original contract of August 26, 1940, was promptly amended after the permit was granted, and the fact that Mr. Steele was compensated on the basis of the original agreement for the entire three years, during which there was never any protest from him that it was not in accord with the understanding and agreement of the parties, all show beyond doubt that paragraph 13, as suggested and drafted by Mr. Morgan and inserted in the contract submitted to the Railroad Commission, was never intended to, and did not then, theretofore, or thereafter, express the true agreement of the parties. However, Mr. Steele knew and carried out the actual understanding and performed the services during the entire period under the re-amended contract, and accepted without protest the agreed compensation of expenses, plus ten per cent. The conclusion is inescapable that the intent and purpose of substituting paragraph 13, as drafted by Mr. Morgan, in lieu of the real agreement, was not to express the intent and agreement of the parties but to serve as an aid in procuring a permit for the Plaintiff from the Railroad Commission. This substitution of paragraph 13 was nothing more nor less than a subterfuge.

It cannot be effectively contended that the contract sued on by the Plaintiff, to wit, the so-called contract of August 26, 1940,

was, in fact, the contract or agreement of the parties, for it appears beyond doubt that the real contract between the parties was the contract of August 26, 1940, as amended by striking out Mr. Morgan's paragraph 13 and reinstating the paragraph that truthfully set out the compensation that the parties had agreed would be paid Steele. This occurred on July 31, 1941. Nevertheless, upon the termination of the contract Mr. Steele, represented by the same attorneys who had advised the entering into of the contract, brought suit against General Mills, Inc., asserting that the agreement for Steele to charge, and for General Mills to pay, less than the minimum rates payable under the Texas statute[2] and the orders of the Railroad Commission[3] to a common carrier performing similar services was illegal and void.

Although Mr. Christopher advised General Mills on April 11, 1941, that he did not believe there would be any element of violation of law involved if subsequently some additional contract was entered into in adjusting the rates, based on experience and service rendered, and added, "it is simply a reasonable business risk, if it is a risk, which you can afford to take," there is no intimation or suggestion in the record of any purpose at that time to entrap the Defendant into the situation into which Plaintiff now seeks to cast it.

The Defendant contended, in defense, that under Section 6-aa of Article 911b of the Texas Vernon's Annotated Civil Statutes the Railroad Commission had the right only to fix the minimum rates for contract carriers which were in competition with common carriers and which were performing substantially the same service, and that Plaintiff was not performing such service, nor in such competition; that although the Railroad Commission had provided by general order that the rates charged by contract carriers should not be less than the minimum rates charged by common carriers,

nevertheless, such rate could be made applicable only upon a specific finding by the Railroad Commission that the particular contract carrier was in competition with, and performing substantially the same service as, a common carrier; that under Section 6-aa of Article 911b, supra, the Railroad Commission was not authorized by the statutes of Texas to prescribe minimum rates for contract carriers who were not performing substantially similar services to, and who were not in competition with, common carriers; that if Section 6-aa of Article 911b, supra, undertakes to delegate such authority to prescribe the minimum rate for all contract carriers whether engaged in competition with common carriers or not, it would be unconstitutional; that the Railroad Commission is a body having a limited jurisdiction under the statute and that any order made within the scope of such statute must affirmatively show that the jurisdictional requisites were present, and in the absence thereof, if the order of the Railroad Commission was intended to apply to the contract operations of the Appellee, then it is void on its face; that the special findings of the jury in the present case that the Appellee was not engaged in rendering substantially similar services to those of a common carrier, and its finding that the Appellee was not engaged in competition with any common carrier, which special verdicts were never set aside, rendered it necessary for the Court to have entered judgment in favor of the Appellant in the light of the asserted insufficiency of Section 6-aa of Article 911b, supra, to confer power upon the Railroad Commission to fix rates for a contract carrier not in such competition nor in the rendition of substantially similar services; that as a matter of fact the operations of Appellee were not similar to, nor in competition with, any common carrier; that the Railroad Commission made findings of fact which expressly and impliedly negatived the

[2] Sec. 6-aa, Article 911b, Texas Vernon's Annotated Civil Statutes, is as follows:

"The Commission is hereby vested with power and authority and it is hereby made its duty to prescribe rules and regulations covering the operation of contract carriers in competition with common carriers over the highways of this State and the Commission shall prescribe minimum rates, fares and charges to be collected by such contract carriers which shall not be less than the rates prescribed for common carriers for substantially the same service."

[3] General Order No. 5, Texas Railroad Commission, provides that:

"The rates, rules, and regulations in this tariff, or as may be amended, shall be observed * * * (B) by contract motor carriers as a minimum, on Texas intrastate traffic, unless permits issued by the Commission provide to the contrary."

existence of competition between Plaintiff and common carriers in the services authorized to be performed by the permit; that if the contract between Appellant and Appellee was in violation of the Texas Statute as contended, then the parties are in pari delicto and the Court should leave them where it found them; that there has been a full settlement and an account stated between the parties; that the Appellee is estopped from maintaining this suit; that the statute of limitations has run against any part of the claim accruing more than two years prior to the institution of the suit.

The jury made negative answers to both of the following special issues submitted to it:

"First: Do you find from a preponderance of the evidence in this case that the operations of plaintiff Steele under his contract with defendant, were in competition with common carriers over the highways of Texas?

"Second: Do you find from the evidence in this case that plaintiff Steele rendered substantially the same services as that rendered by common carriers, during the time and in the area of transportation herein involved?"

Nevertheless, the Court thereafter peremptorily instructed the jury to find for the Plaintiff, and a judgment for Plaintiff in the sum of $37,884.82 was entered against Defendant.

We will not enter into a discussion of the question of whether or not the Railroad Commission was without authority to fix the rates of a contract carrier without first determining whether or not it was in competition with, and performing services substantially similar to, a common carrier, nor the related question as to whether Section 6-aa, without making same applicable to contract carriers in competition with common carriers, is unconstitutional and void, for we agree with Appellee that the supplemental contract to pay rates less than those provided by the Railroad Commission was void, but we think that even so, the judgment should have been against him.

Appellee sued on the statute and the writing that was prepared for presentation to the Railroad Commission, with Mr. Morgan's paragraph 13 therein, which provided for payment to Appellee according to rates and rules of the Railroad Commission, but the evidence is without dispute that paragraph 13 of this alleged contract was never intended by the parties to be a part of the real contract, and was never the basis of payment during the three years of the service. It also is without serious doubt that the substituted paragraph 13, suggested and drawn by Plaintiff's counsel, and setting forth the provision that the applicant would charge the rates fixed by the Commission, was clearly a subterfuge, adopted in order to get by the Railroad Commission, for it was definitely understood that after the permit was obtained this provision would be eliminated and the provision which the Appellee now says was illegal, to wit, the provision to pay his expenses, plus ten per cent, would be put back into the contract.

Nevertheless, the writing of August 26, 1940, is sued on here without mention of the amendment of July 31, 1941, reinstating the original and real agreement of the parties as to the compensation to Steele. There was but one contract that spoke the actual intent and agreement of the parties, and that was the amended contract under which all of the services were performed.

■■■ Appellee says that this provision in the supplemental contract for the payment to him is void, and he ignores the fact that it is a part and parcel of the only contract on which he can declare. A contract modified before there was any performance takes the place of the original one, and consists of the new terms and any provisions of the original contract which the parties agree shall remain unchanged. Steele performed and was paid under the modified contract and a party cannot take the benefits of the modifying stipulations and at the same time repudiate their burdens. See 10 Tex.Jur., § 207, page 365.

■■■ We think with Appellee that the so-called supplemental contract was void, but we also think that the inserted provision for the payment of such rates as the Commission should fix was a mere subterfuge that was never a part of the real agreement, intent, or purpose of the parties; but that even if it had been bona fide and genuine when the instrument was amended prior to any performance, such amendment eliminated the spurious paragraph 13 and became as much a part of the contract as did any other paragraph thereof, and whatever there is of illegality in the method of payment is a part and parcel of the only contract between the parties. The provision for payment under rates and rules of the Railroad Commission so taken out and discarded never was in-

tended to be, and, therefore, never was, in fact or in law, the agreement of the parties.

Moreover, when General Mills and Steele agreed to the insertion of paragraph 13, as suggested and drawn by Mr. Morgan, for the sole purpose of getting by the Railroad Commission, well knowing that such a provision was not to be a permanent part of the contract and that it was not expected to be retained or complied with, they committed a fraud upon the lawfully constituted officials of the State of Texas, viz., the Railroad Commission. The conclusion seems inescapable that both parties knew full well that this was a subterfuge, and that neither had any idea of paying the rates provided for in that instrument, and that their participation in the execution thereof with the intent to use it only as a "front" for getting a permit for Steele was an act contrary to good morals and that tended to injustice and to interfere with the purity of the administration of the law such as puts both parties in pari delicto with no right to seek advantage or recovery out of paragraph 13, the spurious portion of the instrument.

These views are in no wise in conflict with the holdings of this Court in the case of Bowen Motor Coaches v. New York Casualty Co., 139 F.2d 332, 335, but in conformity therewith, for in that case we held that under the facts "there was here no corrupt agreement to violate the law. No crime was to be committed. The parties were trying to act in accordance with the statute." The inference is that if there had been a corrupt agreement to violate the law, or if the parties had been trying to violate the statute instead of acting in accordance with it, the doctrine of pari delicto would have been applied.

In Battles v. Braniff Airways, 146 F.2d 336, we did not expressly say so, but impliedly we agreed with the Appellant's contention that since he was a receiver representing not merely the company but its creditors, he would not be adjudged in pari delicto.

There should be a distinction between a receiver suing in behalf of creditors and a plaintiff who is particeps criminis suing under the very statute that he so glibly violated.

Plaintiff, however, was not content to stand solely upon his alleged contract. He also claims a right of recovery because of the statutes of the State of Texas and the regulations and orders of its Railroad Commission. In other words, he asserts that he is entitled to recover under the contract sued on, and that he is also entitled to recover under the statute of Texas which provides that a contract carrier shall charge, and the shipper shall pay, the rates prescribed by the Commission, which cannot be less than the minimum rates charged by a common carrier performing similar services. Having definitely concluded that he has no right of recovery under paragraph 13 of the contract sued on, we next inquire whether or not the Plaintiff can sustain his claimed right to recover under the statute.[4] The pertinent statutes of Texas make it illegal for a contract carrier to charge other than the rates prescribed and fixed by the Commission, and the failure to comply with the law, or with the lawful regulations and orders of the Commission, is a misdemeanor punishable by fine. The violator is also subject to a penalty recoverable by the State at the suit of its Attorney General or the District, or County, Attorney. No Texas statute expressly declares that a contract contrary to the statutes or regulations shall be void, nor do any of them contain an express provision authorizing a suit by anyone—other than the Attorney General, the District, or County, Attorney, in a suit on behalf of the State of Texas to recover the penalty of $100.00 per day for each day's violation—such as is found in the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., the Anti Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, or the Price Control Act, 50 U.S.C.A. Appendix, § 901 et seq. There is no ruling here of the Interstate Commerce Commission or other governmental agency that requires the carrier to sue to recover undercharges such as Interstate Commerce Commission Conf. Ruling #314, Bulletin 7, saying in part:

"It follows that it is the duty of carriers to exhaust their legal remedies in order to collect undercharges from the party or parties legally responsible therefor."

It will be assumed, however, that any contract, the execution of which is a criminal offense, is illegal and unenforceable. It may also be true that even though there is no provision in the statute authorizing a person to bring suit under it, nevertheless, he may do so if he has been specially injured and if it clearly appears that the statute was enacted for his protection or

---

[4] Art. 1690b, Vernon's Texas Penal Code. Pars. (b), (c), (g), (h), and (i).

**374**

benefit,[5] and if he by his own participation in some illegal arrangement has not barred his right to relief through the processes of the Court.

The statute here does not expressly authorize a suit for the recovery of the prescribed rates by anyone and we should not hold it to be the law that one has a statutory cause of action under a statute which he has intentionally violated and disregarded unless there is express language, or a clear intent on the part of the Legislature, that the particular statute was enacted for his benefit and protection.

■ In the instant case the statute was not for the benefit of contract carriers but for the benefit of common carriers.

The Plaintiff here can show no special damage. He received a clear profit of ten per cent out of every truckload that he hauled. Moreover, he cannot claim special damages to himself which he himself caused by his own conduct and contract.

In 1 Tex.Jur. § 18, page 625, appears this statement:

"In general the law affords to private persons a remedy for private wrongs only. So where a statute prohibits the doing of a particular act affecting the public, the mere commission of the prohibited act confers no personal or private right of action."

A statute that is passed for the protection of the general public against negligence can be the basis of a suit for a recovery by anyone specially injured as a result of failure

---

[5] "An action for the violation of a statutory duty is generally maintainable by any person injured thereby, who suffers a special damage therefrom, and who is of a class entitled to take advantage of the law. Within the meaning of this rule, persons entitled to take advantage of the law are members of the class intended to be protected by the statute, or for the benefit of whom the statute was enacted. Indeed, even though the violation of a statute is regarded as actionable, it is generally required that the injury be done to one of the class designed to be protected by the statute, or for whose benefit the statute was enacted, and to whom a duty of compliance with the statute is owed. It has also been stated as general rules that a statutory right of action may be maintained only for the benefit of the persons specified in the statute, and that where a right is given by statute, only those to whom the right is in terms given may avail themselves of its benefits." 50 Am.Jur., § 587, page 582.

In Norwood v. Galveston H. & S. A. R. Co., 12 Tex.Civ.App. 560, 34 S.W. 180, the Texas Court of Civil Appeals, citing and quoting Blackstone, said:

" 'The law gives no private remedy for anything but a private wrong.'

" 'Where a statute prohibits the doing of a particular action affecting the public, no person has a right of action against another merely because he has done the prohibited act. It is incumbent on the part of the complainant to allege and prove that the doing of the act prohibited has caused him some special damage, some particular injury, beyond that which he may be supposed to have sustained in common with the rest of the queen's subjects by an infringement of the law.' "

In Texas & N. O. R. Co. v. Brotherhood of Ry. Steamship Clerks, 33 F.2d 13, 16, we said:

"The violation of a duty created by statute, resulting in damage to one of a class for whose benefit the duty was imposed, confers a right of action upon the injured person, though the statute makes no provision as to a remedy for such a wrong. Marbury v. Madison, 1 Cranch. 137, 163, 2 L.Ed. 60; DeLima v. Bidwell, 182 U.S. 1, 176, 21 S.Ct. 743, 45 L.Ed. 1041; 1 Corpus Juris 951."

"[A statutory] right of action exists only in favor of those for whose benefit the duty is imposed, and Plaintiff must show not only a violation of the statute but that the inquiry complained of was occasioned thereby." 1 C.J. 952, § 47.

" * * * The true rule is that the question depends upon the intention of the legislature as construed from the provisions of the particular statute; and if it appears that the duty imposed is merely for the benefit of the public, and the fine or penalty a means of enforcing the duty and punishing a breach thereof, the fine or penalty is exclusive, and a private action cannot be maintained for injury sustained by reason of the breach. If, on the other hand, it appears that the duty imposed is also for the benefit of particular individuals or classes of individuals, a private right of action arises for injury sustained by reason of the breach, by any person the statute was designed to protect, provided the injury sustained by him is a special injury different from that inflicted on the general public, and has resulted proximately from and because of the violation; * * *" 1 C.J.S., Actions, § 12, page 996.

to observe such statute, similarly as one may recover under a contract entered into by third parties for his benefit, such as a contract between the City and a water company to supply water with which to fight fire,[6] but the provision in the statute here to require a contract carrier who is in competition with common carriers rendering substantially similar service to charge not less than such common carrier was to protect the common carrier from indiscriminate and disastrous competition. It will be noted here that the statutory requirement was not that the contract carrier should not charge more than a common carrier, but that it should not charge less than such common carrier. It was not a regulation for the benefit of the citizens generally in an endeavor to secure cheaper transportation, nor was it for the purpose of benefiting one who purposefully violated it.[7] Moreover, a contract carrier who hauls for only one customer cannot be guilty of discrimination in the matter of rates. He has no other customer in whose favor he could discriminate. The statutes against discrimination by a contract carrier having only one customer were never intended for the benefit or protection of either the contract carrier or his customer, but were intended only to prevent a contract carrier who is in competition with a common carrier in the performance of similar services from underselling the common carrier. The present suit is not a suit by a common carrier; it is not a suit for penalties by the Attorney General; but it is a suit by one who violated the statute for three years, and until the end of his contract, meanwhile being protected from any hazard of financial loss by receiving all expenses back, plus a profit of ten·per cent, and who, when such profit ceased to flow, then decided that the statute ought to be enforced—but only as against his contractee.

Surely a Daniel has come to judgment and from what a remarkable source!

▮ The statute was not enacted for his protection, and we are of the opinion that the Plaintiff has no right of action either under the contract or under the statute.

The judgment should have been for the Defendant and the cause is reversed with directions to enter such judgment.

Reversed.

HUTCHESON, Circuit Judge (dissenting).

I deprecate as much as my associates do the fact that appellee, a trusted employee of appellant and well represented by counsel, has welshed on his agreement, deliberately and thoughtfully entered into on advice of counsel, and in the name of the law is profiting thereby. But I cannot agree that appellant may in law be allowed to have the service performed without paying the statutory rate it agreed, and the law compelled it to pay. I think it clear that the district judge was right in the view he took, that the authorities in Texas leave in no doubt that rates prescribed by the Texas Railroad Commission are the only proper rates which may be charged and that a cause of action arises out of the statute in favor of any person who performs the services for which the rates are prescribed. The Railroad Commission's general order of 1931, therefore, prescribing common carrier rates as minimum rates was applicable to Steele's permit and was valid and enforceable. The supplemental contract for a less rate which was never approved by the Commission was not a valid contract of carriage, and though the parties acted, and payments were made, under it, this constitutes no defense to an action for the statutory rate. Herrin Transp. Co. v. Marmion, Tex.Civ. App. 113 S.W.2d 291; Pittsburgh v. Fink, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151. On the authority of Texas cases which apply the same doctrine to insurance rates that they do to carrier rates, we held in Bowen Motor Coaches v. New York Casualty Co., 5 Cir., 139 F.2d 332, that no contract could change the statutory rates and that they must be collected. To the suggestion made there that because the parties were in pari delicto in making an unlawful

---

[6] Mugge v. Tampa Water Works Co., 53 Fla. 371, 42 So. 81, 6 L.R.A.,N.S., 1171, 120 Am.St.Rep. 207.

[7] "Appellant presents several propositions, but we deem it unnecessary to discuss them, because the law is well settled that no legal right arises out of an unlawful act; and no action can be maintained upon a claim arising out of or based upon an illegal act, if plaintiff must rely in any way upon the illegal transaction to make out or establish his case. Dufek v. Harrison County, Tex. Civ.App., 289 S.W. 741; 1 Tex. Jurisprudence, 629; 1 C. J. 957; 1 R. C. L. 317; and numerous cases there cited and discussed." Heard v. Denman, Tex. Civ.App., 29 S.W.2d 824.

contract, plaintiff could not recover, we said, "There was here no corrupt agreement to violate the law. No crime was to be committed." In *Battles v. Braniff*, 5 Cir., 146 F.2d 336, we held that no matter how illegal an agreement, to pay a less premium than the statute, was, or how illegally it was entered into, it would be ineffective to prevent recovery in a suit on the policy for the premiums the law fixed as due.

I cannot, therefore, agree with the view of my associates, that the appellant should be permitted to have its freight hauled for a less charge than others were under the law compelled to pay, and appellee, because in pari delicto with appellant, may not recover. In the first place, I do not agree that the evidence supports the view the majority opinion expresses that the parties entered into their arrangements with the deliberate purpose of defeating the law. Their letters and their conduct, I think, show beyond question that they thought they were not evading but complying with the law. From the letters of Christopher and the attorneys for General Mills no other view may be gathered than that they thought that the services to be performed by Steele would not be similar services to those performed by common carriers, and the Commission's 1931 general order, making common carrier rates minimum for contract carriers performing similar services did not therefore apply. I am of the opinion, therefore, that when the agreement was made, they did not intend to commit a crime, that is, to violate the law and subject themselves to a penalty of $200 a day each. If this is the correct view of the facts, and I think it is, then clearly the pari delicto doctrine does not apply. *Bowen v. New York Casualty Co.*, supra.

But if I could agree that there was a deliberate intent to defraud the statute, I still could not agree with the majority, whether plaintiff's suit is to be regarded as on the written contract which was exhibited to and filed with the Commission, or on the right arising out of the statute to recover the legal charges for the services rendered, for the right to recover the legal charges and no other rests on an overriding public policy. This policy is so imperative that it may not be defeated by the conduct of the parties in entering into legal and evasive arrangements which it is the very purpose of the policy to strike down. It remains to consider only whether the suit was on the contract signed by the parties and exhibited to the Commission as a basis for the permit, and, therefore, the defense of limitation is unavailable, or was on the statutory obligation arising from the performance of the service, and, therefore, limitation has barred a part of the recovery. It seems clear to me that plaintiff's suit is on the contract, which the parties made and exhibited to the Commission, and in which they agreed to pay the legal rates, and that the case is ruled by *Central Freight Lines v. C & S Motor Freight Lines*, Tex.Civ.App., 125 S.W.2d 615. There the court held ineffective a private agreement which, as here, was not submitted to the Commission. I think the judgment should be affirmed, and I respectfully dissent from its reversal.

## On Petition for Rehearing.

Before WALLER and LEE, Circuit Judges.

### PER CURIAM.

We are indebted to the Attorney General of the State of Texas for his able brief as amicus curiae on the petition for rehearing.

The suit here was not one to enforce, to rescind, nor to enjoin an executory or uncompleted contract. It was a suit by one party, a particeps criminis, against another in like situation, under a fully completed contract, wherein it was sought to penalize one party to the extent of $37,000 and to reward the prime offender in like amount. We refer to the Appellee as the "prime offender" for the reason that it was he, who got the permit from the Railroad Commission of the State of Texas, who used the highways of the State, and who engaged in the business of contract transportation which the Texas law sought to regulate. Although we do not undertake to measure the degree of delictum, it certainly cannot be insisted that the shipper had a greater responsibility to the public than the certificate holder, or truck operator. The statutes of Texas allow recovery of a penalty against both parties at the suit of the Attorney General, which penalty would go to the State of Texas, and not to a violator of the law. We have been cited no case in Texas that compels the conclusion that where the Court finds both parties in pari delicto under a *contract that has been fully executed* it should lend its aid to one in preference to the other. The

law of Texas is to the contrary. See Wright v. Wight & Wight, Tex.Civ.App., 229 S.W. 881.

In 10 Tex.Jur., page 242, § 140, there is this statement:

*"Recovery of Money or Property Parted With.*—Where an illegal contract has been fully executed, the courts will not interfere to litigate the claims of parties in pari delicto who have been injured thereby; neither a court of law nor a court of equity will aid either party to recover or reinvest himself with any title or interest vested in the other, but will leave them in the same position as to vested interests as they, by their own acts, have placed themselves. So money paid under an illegal contract may not be recovered back, where the contract has been fully executed and the parties are in pari delicto."

See also 12 Amer.Jur. page 725, § 213.

This is also the law as announced in Federal courts. In Spring Co. v. Knowlton, 103 U.S. 49, 58, 26 L.Ed. 347, the Supreme Court cited recognized texts on contracts in support of the same rule announced in Wright v. Wight & Wight, supra, and also quoted the following statement from one of those texts on contracts:

"Where money has been paid upon an illegal contract, it is a general rule that if the contract be executed and both parties are in pari delicto, neither of them can recover from the other the money so paid, but if the contract continues executory and the party paying the money be desirous of rescinding it, he may do so and recover back by action of indebitatus assumpsit for money had and received."

The petition for rehearing is denied.